**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2548
_____

UNITED STATES OF AMERICA,
Appellant

v.

HARRY KATZIN; MICHAEL KATZIN; MARK LOUIS
KATZIN, SR.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 5:11-cr-00226)
District Judge: Honorable Gene E.K. Pratter
_____

Argued on March 19, 2013
Rehearing En Banc Ordered on December 12, 2013
Argued En Banc May 28, 2014
_____

Before: McKEE, *Chief Judge*, RENDELL, AMBRO,
FUENTES, SMITH, FISHER, CHAGARES, JORDAN,

HARDIMAN, GREENAWAY, JR., VANASKIE, SHWARTZ, and VAN ANTWERPEN, *Circuit Judges*.

(Filed: October 1, 2014)
_____

Robert A. Zauzmer, Esq. [ARGUED]
Emily McKillip, Esq.
Zane D. Memeger, Esq.
Thomas M. Zaleski, Esq.
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
        *Counsel for Appellant United States of America*

Catherine N. Crump, Esq. [ARGUED]
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Thomas A. Dreyer, Esq.
Suite 110
6 Dickinson Drive
Building 100
Chadds Ford, PA 19317-0000
        *Counsel for Appellee Harry Katzin*

William A. DeStefano, Esq.
Stevens & Lee
1818 Market Street
29th Floor

Philadelphia, PA 19103
*Counsel for Appellee Michael Katzin*

Rocco C. Cipparone, Jr., Esq.
205 Black Horse Pike
Haddon Heights, NJ 08035-0000
*Counsel for Appellee Mark Louis Katzin, Sr.*

Brett G. Sweitzer, Esq.
Federal Community Defender Office for the Eastern District
of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
*Counsel for Amicus Appellee Federal Public &*
*Community Defender Organization of the Third Circuit*

Catherine N. Crump, Esq. [ARGUED]
Nathan Wessler, Esq.
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Benjamin E. Wizner, Esq.
American Civil Liberties Union
National Security Project
125 Broad Street
18th Floor
New York, NY 10004
*Counsel for Amicus Appellee American Civil Liberties*
*Union*

Catherine N. Crump, Esq. [ARGUED]
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Sara J. Rose, Esq.
Witold J. Walczak, Esq.
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA 15213
    *Counsel for Amicus Appellee American Civil Liberties*
    *Union Foundation of Pennsylvania*

Catherine N. Crump, Esq. [ARGUED]
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Hanni M. Fakhoury, Esq.
Marcia Hoffman, Esq.
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
    *Counsel for Amicus Appellee Electronic Frontier*
    *Foundation*

Catherine N. Crump, Esq. [ARGUED]
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Peter Goldberger, Esq.
50 Rittenhouse Place
Ardmore, PA 19003
    *Counsel for Appellee National Association of Criminal Defense Lawyers*

_____

OPINION OF THE COURT
_____


VAN ANTWERPEN, *Circuit Judge*, with whom RENDELL, FISHER, CHAGARES, JORDAN, HARDIMAN, VANASKIE, and SHWARTZ, *Circuit Judges*, join.

The instant appeal arises out of the warrantless installation of a Global Positioning System device (a "GPS" or "GPS device") and subsequent surveillance by agents working for the Federal Bureau of Investigation ("FBI") of a van while investigating multiple pharmacy burglaries. The warrantless surveillance led to evidence of the involvement of brothers Harry, Michael, and Mark Katzin (collectively, "Appellees") in the burglaries. Slightly more than a year after the GPS installation and surveillance, the Supreme Court decided *United States v. Jones*, which held that the installation of a GPS device by government agents upon the exterior of a vehicle and subsequent use of that device to monitor the vehicle's movements is a Fourth Amendment "search." 132 S. Ct. 945, 949 (2012). As a result, Appellees successfully moved prior to trial to suppress the evidence collected pursuant to the warrantless GPS surveillance, effectively ending the Government's prosecution. We conclude that the evidence is admissible under the good faith

5

exception to the exclusionary rule and reverse the District Court's grant of Appellees' suppression motions.

## I.    BACKGROUND

In 2009 and 2010, the FBI and local police officers were investigating a series of pharmacy burglaries occurring in the greater Philadelphia area, including Delaware, Maryland, and New Jersey. The *modus operandi* was consistent: the perpetrators, who targeted Rite Aid pharmacies, disabled alarm systems by cutting the external telephone lines.

Eventually, Harry Katzin emerged as a suspect. A local electrician, he had recently been arrested for attempting to burglarize a Rite Aid pharmacy, and he and his brothers had criminal histories involving arrests for burglary and theft. Increasingly, investigators received reports of Harry Katzin's involvement in suspicious activities in the vicinity of Rite Aid pharmacies.[1] Their investigation revealed the make and

---

[1] For example, in October 2010 Pennsylvania police found Harry Katzin crouching behind bushes near a Rite Aid. They did not arrest him but the following day discovered the Rite Aid's phone lines had been cut. A month later, police searched Harry Katzin's van after discovering him and two other individuals (including his brother Michael) sitting inside it near a Rite Aid. Police found tools, work gloves, and ski masks in the van but did not arrest the men. Again, police later discovered the Rite Aid's phone lines were cut. Finally, that same month, surveillance camera footage from a burglarized New Jersey Rite Aid showed a van similar to Harry Katzin's parked in its vicinity.

model of Harry Katzin's van, as well as where he primarily parked it, and the agents sought to electronically surveil him. The agents conferred with an Assistant United States Attorney ("AUSA") who advised them, in conformity with Department of Justice ("DOJ") policy at the time, that installing a battery-powered GPS device upon Harry Katzin's van on a public street and tracking its movements on public thoroughfares would not require a warrant. Subsequently, on December 13, 2010, without a warrant, officers magnetically attached a battery powered "slap-on" GPS device[2] onto the undercarriage of Harry Katzin's van while it was parked on a public street.

Two days later, at approximately 10:45 p.m. on December 15, 2010, the GPS device indicated that Harry Katzin's van had left Philadelphia and proceeded on public thoroughfares to the immediate vicinity of a Rite Aid in Hamburg, Pennsylvania. According to the GPS device, the van drove around the area before stopping and remaining stationary for over two hours. The agents contacted local police but instructed them to maintain a wide perimeter to avoid alerting the suspects. Consequently, the GPS provided the only evidence of the van's proximity to the Rite Aid. The van left its position at nearly 3:00 a.m. and state troopers

---

[2] A "slap-on" GPS device magnetically attaches to a vehicle's exterior and is battery powered, requiring no electrical connection to the vehicle. It uses a network of satellites to calculate its location and transmits the data to a central server. An officer need not physically track nor be near the automobile. The GPS that the agents used had a battery life of one week (although the agents could have changed the batteries, if necessary).

7

followed. Meanwhile, local police confirmed that someone had burglarized the Rite Aid and relayed this information to the troopers, who pulled over the van. Troopers found Harry Katzin at the wheel with Michael and Mark as passengers. From outside the van, troopers observed items consistent with the burglary of a Rite Aid.[3] They arrested Appellees and impounded the van. In all, the warrantless GPS surveillance lasted for two days and occurred only on public thoroughfares.

Appellees were indicted and each moved to suppress the evidence recovered from the van. They argued that the warrantless installation and monitoring of the GPS device violated their Fourth Amendment rights pursuant to *Jones*. The Government argued, *inter alia*, that even if *Jones* now required a warrant, the evidence should not be suppressed because the agents acted in good faith when installing and monitoring the GPS device.

The United States District Court for the Eastern District of Pennsylvania granted Appellees' suppression motions. *United States v. Katzin*, No. 11-226, 2012 WL 1646894, at *11 (E.D. Pa. May 9, 2012). The District Court found that a warrant was required under *Jones*. *Id.* at *5–6. Relying on *Davis v. United States*, 131 S. Ct. 2419 (2011), it also rejected the Government's good faith argument, refusing to "extend the good faith exception to encompass the conduct in this case." *Id.* at *10. Finally, it concluded that, contrary to the Government's contention, passengers Mark and Michael

---

[3] The state trooper saw merchandise, pill bottles, Rite Aid storage bins, tools, a duffel bag, and a surveillance system with severed wires.

8

Katzin had standing to challenge the search of Harry Katzin's van. *Id.* at \*11. The Government appealed.

A panel of this Court unanimously affirmed the District Court's conclusions that the agents' conduct required a warrant and that all three brothers had standing. *United States v. Katzin*, 732 F.3d 187, 191 (3d Cir. 2013), *vacated by United States v. Katzin*, No. 12-2548, 2013 WL 7033666 (3d Cir. Dec. 12, 2013) (granting rehearing *en banc*). However, the panel divided over whether the good faith exception applied and, consequently, whether suppression was appropriate. *See id.* at 216–41 (Van Antwerpen, J., dissenting). The Government petitioned for, and we granted, rehearing *en banc* on the singular issue of whether the evidence recovered from Harry Katzin's van should be shielded from suppression pursuant to the good faith exception to the exclusionary rule. *Katzin*, 2013 WL 7033666, at \*1. We conducted the *en banc* rehearing on May 28, 2014.

## II.    DISCUSSION[4]

The Fourth Amendment mandates that

---

[4] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 18 U.S.C. § 3731 and 28 U.S.C. § 1291. In reviewing a motion to suppress, "we review a district court's factual findings for clear error, and we exercise *de novo* review over its application of the law to those factual findings." *United States v. Pavulak*, 700 F.3d 651, 660 (3d Cir. 2012).

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Accordingly, the Fourth Amendment only prohibits "unreasonable" searches and seizures. *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989); *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995) ("[T]he ultimate measure of the constitutionality of a governmental search is 'reasonableness.'"). Searches conducted absent a warrant are *per se* unreasonable under the Fourth Amendment, subject to certain exceptions. *United States v. Harrison*, 689 F.3d 301, 306 (3d Cir. 2012). To deter Fourth Amendment violations, when the Government seeks to admit evidence collected pursuant to an illegal search or seizure, the judicially created doctrine known as the exclusionary rule at times suppresses that evidence and makes it unavailable at trial. *Herring v. United States*, 555 U.S. 135, 139 (2009). However, even when the Government violates the Fourth Amendment, ill-gotten evidence will not be suppressed when the good faith exception to the exclusionary rule applies. *See, e.g.*, *United States v. Leon*, 468 U.S. 897, 920–26 (1984) (refusing to exclude fruits of unreasonable search because officer acted with objective good faith on later invalidated warrant).

Consequently, we need not determine whether the agents' conduct was an unreasonable search because, even

10

assuming so, we conclude that the good faith exception applies, and that suppression is unwarranted.[5] However, we caution that, after *Jones*, law enforcement should carefully consider that a warrant may be required when engaging in such installation and surveillance. We also need not reach the issue of whether Mark and Michael Katzin have standing to challenge the agents' conduct because, even assuming so, the outcome—admission of the evidence at trial—would remain unchanged.[6] *See United States v. Stearn*, 597 F.3d 540, 553 (3d Cir. 2010) (noting that district court only needed to determine "standing" to the extent it held searches unreasonable); *United States v. Varlack Ventures, Inc.*, 149 F.3d 212, 216 (3d Cir. 1998) (declining to decide standing where court determined that law enforcement properly conducted warrantless search). We nevertheless acknowledge that, under the law of the Third Circuit, *United States v. Mosley*, 454 F.3d 249 (3d Cir. 2006) appears to control.

> A.    *The Exclusionary Rule and the Good Faith Exception*

---

[5] This approach is consistent with that taken by our sister circuits when addressing the installation and use of GPS or GPS-like devices that occurred prior to *Jones*. *See, e.g.*, *United States v. Brown*, 744 F.3d 474, 476 (7th Cir. 2014); *United States v. Aguiar*, 737 F.3d 251, 255 (2d Cir. 2013); *United States v. Andres*, 703 F.3d 828, 834 (5th Cir. 2013); *United States v. Pineda-Moreno*, 688 F.3d 1087, 1090 (9th Cir. 2012).

[6] We use the term "standing" as shorthand for determining whether a litigant's Fourth Amendment rights are implicated. *See United States v. Mosley*, 454 F.3d 249, 253 n.5 (3d Cir. 2006).

Whether to suppress evidence under the exclusionary rule is a separate question from whether the Government has violated an individual's Fourth Amendment rights. *Hudson v. Michigan*, 547 U.S. 586, 591–92 (2006). Despite its connection to the Fourth Amendment, there is no constitutional right to have the evidentiary fruits of an illegal search or seizure suppressed at trial. *See, e.g.*, *Davis*, 131 S. Ct. at 2426 (noting that the Fourth Amendment "says nothing about suppressing evidence obtained in violation of [its] command"). The exclusionary rule is instead "a judicially created means of effectuating the rights secured by the Fourth Amendment." *Stone v. Powell*, 428 U.S. 465, 482 (1976). Simply because a Fourth Amendment violation occurs does not mean that exclusion necessarily follows. *E.g.*, *Herring*, 555 U.S. at 140. Rather, "exclusion 'has always been our last resort, not our first impulse.'" *Id.* (quoting *Hudson*, 547 U.S. at 591).

Application of the exclusionary rule is instead limited to those "unusual cases" in which it may achieve its objective: to appreciably deter governmental violations of the Fourth Amendment. *Leon*, 468 U.S. at 909, 918; *see also United States v. Duka*, 671 F.3d 329, 346 (3d Cir. 2011). To the extent the promise of admitting illegally seized evidence creates an incentive to disregard Fourth Amendment rights, the exclusionary rule removes that incentive by "forbid[ding] the use of improperly obtained evidence at trial." *Herring*, 555 U.S. at 139. It thereby "compel[s] respect for the [Fourth Amendment's] constitutional guaranty." *Elkins v. United States*, 364 U.S. 206, 217 (1960).

However, while "[r]eal deterrent value" is necessary for the exclusionary rule to apply, there are other

12

considerations and it alone is not sufficient. *Davis*, 131 S. Ct. at 2427. Deterrence must also outweigh the "substantial social costs" of exclusion. *Leon*, 468 U.S. at 907. These costs often include omitting "reliable, trustworthy evidence" of a defendant's guilt, thereby "suppress[ing] the truth and set[ting] [a] criminal loose in the community without punishment." *Davis*, 131 S. Ct. at 2427. As this result conflicts with the "truth-finding functions of judge and jury," *United States v. Payner*, 447 U.S. 727, 734 (1980), exclusion is a "bitter pill," *Davis*, 131 S. Ct. at 2427, swallowed only as a "last resort," *Hudson*, 547 U.S. at 591. Accordingly, to warrant exclusion, the deterrent value of suppression must overcome the resulting social costs. *Davis*, 131 S. Ct. at 2427.

The good faith exception to the exclusionary rule was developed to effectuate this balance and has been applied "across a range of cases."[7] *Id.* at 2428. Where the particular facts of a case indicate that law enforcement officers "act[ed] with an objectively 'reasonable good-faith belief' that their conduct [was] lawful, or when their conduct involve[d] only simple, 'isolated' negligence," there is no illicit conduct to deter. *Id.* at 2427–28 (citations omitted) (quoting *Leon*, 468 U.S. at 909; *Herring* 555 U.S. at 137). In such circumstances, "the deterrence rationale loses much of its force and exclusion

---

[7] *See Davis*, 131 S. Ct. at 2429 (applying good faith exception where officers relied on binding appellate precedent); *Herring*, 555 U.S. at 147–48 (same, with police-maintained outstanding warrant database); *Arizona v. Evans*, 514 U.S. 1, 14–16 (1995) (same, with court-maintained database); *Illinois v. Krull*, 480 U.S. 340, 349–50 (1987) (same, with subsequently invalidated statute); *Leon*, 468 U.S. at 922 (same, with subsequently invalidated warrant).

cannot pay its way." *Id.* at 2428 (quoting *Leon*, 468 U.S. at 907 n.6, 919) (internal quotation marks omitted). Alternatively, where law enforcement conduct is "deliberate, reckless, or grossly negligent" or involves "recurring or systemic negligence," deterrence holds greater value and often outweighs the associated costs. *Id.* at 2427–28 (quoting *Herring*, 555 U.S. at 144) (internal quotation marks omitted). Put differently, exclusion is appropriate only where law enforcement conduct is both "sufficiently deliberate" that deterrence is effective and "sufficiently culpable" that deterrence outweighs the costs of suppression. *Herring*, 555 U.S. at 144. Thus, determining whether the good faith exception applies requires courts to answer the "objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *Id.* at 145 (quoting *Leon*, 468 U.S. at 922 n.23) (internal quotation marks omitted).

### *1.* Davis v. United States

In *Davis*, the Supreme Court applied the good faith exception in the context of law enforcement officers' reliance on judicial decisions. 131 S. Ct. at 2423–24. Specifically, *Davis* held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Id. Davis*' holding implicated two prior Supreme Court decisions, *New York v. Belton*, 453 U.S. 454 (1981) and *Arizona v. Gant*, 556 U.S. 332 (2009).

In *Belton*, the Supreme Court announced a seemingly broad and permissive standard regarding searches incident to arrest. 453 U.S. at 460 ("[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he

may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." (footnote omitted)). It was widely understood that the Court had issued a bright-line rule, and that vehicle searches incident to the arrest of recent occupants were reasonable, regardless of whether the arrestee "was within reaching distance of the vehicle at the time of the search." *Davis*, 131 S. Ct. at 2424. However, as *Davis* noted, the Supreme Court's subsequent decision in *Gant* upset this interpretation of *Belton*. *Id.* at 2425. After *Gant*, a vehicle search incident to a recent occupant's arrest was only constitutionally reasonable where (1) "the arrestee [was] within reaching distance of the vehicle during the search, or (2) . . . the police ha[d] reason to believe that the vehicle contain[ed] 'evidence relevant to the crime of arrest.'" *Id.* (quoting *Gant*, 556 U.S. at 343).

Before *Gant*, the Eleventh Circuit had been one of many federal appeals courts to read *Belton* as establishing a permissive rule. *See United States v. Gonzalez*, 71 F.3d 819, 822 (11th Cir. 1996) (upholding search of vehicle conducted after recent occupant was "pulled from the vehicle, handcuffed, laid on the ground, and placed under arrest"). After *Belton* and *Gonzalez*, but before *Gant*, police officers in a case arising in the Eleventh Circuit arrested both the driver of a vehicle and the vehicle's occupant, Willie Davis. 131 S. Ct. at 2425. After handcuffing and placing them in the back of separate patrol cars, officers searched the vehicle and found a revolver in Davis' jacket. *Id.* The District Court denied Davis' Fourth Amendment challenge, but during the pendency of his appeal from his conviction for possession of a firearm by a convicted felon, the Supreme Court decided *Gant*. *Id.* at 2426. Accordingly, when *Davis* reached the Supreme Court, it was necessary to address "whether to apply

15

the exclusionary rule when the police conduct a search in objectively reasonable reliance on binding judicial precedent," such as *Gonzalez*. *Id.* at 2428.

Crucial to *Davis*' holding that suppression was not warranted was the "acknowledged absence of police culpability." *Id.* The officers' conduct was innocent because they "followed the Eleventh Circuit's *Gonzalez* precedent to the letter" and conducted themselves "in strict compliance with then-binding Circuit law." *Id.* Because "well-trained officers will and should use" a law enforcement tactic that "binding appellate precedent specifically *authorizes*," evidence suppression would only serve to deter what had been reasonable police work. *Id.* at 2429. As this outcome was inimical to the exclusionary rule's purpose, namely deterrence, the Supreme Court applied the good faith exception to the officers' conduct, rendering suppression inappropriate. *Id.* ("About all that exclusion would deter in this case is conscientious police work.").

### B.   *The District Court's Reliance on* Davis

In the case at bar, the District Court refused to "stray[] from the limitations set forth in *Davis* and expand[] the good faith exception." *Katzin*, 2012 WL 1646894, at \*9–10. It viewed *Davis* as setting forth a requirement that there be relevant binding precedent within the circuit. *Id.* at \*7. Because no binding Third Circuit precedent specifically authorized the agents' actions*,* it reasoned that applying the good faith exception would involve "[e]xtending" the holding of *Davis* from binding appellate precedent to an area of unsettled law. *Id.* at \*7, \*9. Still, it acknowledged that "an argument could be made . . . that the more general good faith

16

exception language" permits "individualized determination" of whether law enforcement acted objectively reasonably in specific cases. *Id.* at *9. It also "hasten[ed] to emphasize" its lack of concern that the agents acted in a "calculated or otherwise deliberately cavalier or casual manner in the hopes of just meeting the outer limits of the constitutional contours of [Appellees'] rights." *Id.* at *10 n.15. It admitted that the agents "could well profess surprise at the specific outcome of *Jones*." *Id.* Despite these conclusions, however, the District Court refused "to move beyond the strict *Davis* holding," and it suppressed the evidence against Appellees.[8] *Id.* at *9. Appellees urge us to adopt the District Court's interpretation of *Davis*. They argue that no binding appellate precedent under *Davis* existed upon which the agents could reasonably rely, and they warn us to refrain from "fabricat[ing] a new ground for application of the 'good faith' exception": reliance on a "settled body of persuasive authority." (Appellees' Corrected Supplemental *En Banc* Brief ("Appellee *En Banc* Br.") at 3–4.)

> C.    *The agents acted in good faith under both* Davis v. United States *and the general good faith exception.*

_____

[8] The District Court relied on "policy issues" it believed militated against "[e]xtending *Davis*" and applying the good faith exception. *Katzin*, 2012 WL 1646894, at *9. Specifically, it questioned the practicality of assigning authoritative weight to out-of-circuit decisions, noted that the good faith exception generally involved "reliance on unequivocally binding legal authority," and concluded that reliance on out-of-circuit authority "at least border[ed] on being categorized as systemic negligence." *Id.*

17

We disagree with the District Court in two respects. First, we conclude that the exclusionary rule should not apply because, at the time of the agents' conduct in this case, the Supreme Court's decisions in *United States v. Knotts*, 460 U.S. 276 (1983) and *United States v. Karo*, 468 U.S. 705 (1984) were binding appellate precedent upon which the agents could reasonably have relied under *Davis*. In the alternative, we conclude that, under the Supreme Court's more general good faith test, the evidence should not be suppressed because the agents acted with a good faith belief in the lawfulness of their conduct that was "objectively reasonable." *Davis*, 131 S. Ct. at 2427.

> *1.* Knotts *and* Karo *were binding appellate precedent upon which the agents could reasonably have relied under* Davis.

As an initial matter, it is self-evident that Supreme Court decisions are binding precedent in every circuit. *See, e.g.*, *United States v. Aguiar*, 737 F.3d 251, 260–61 (2d Cir. 2013) (rejecting contention that "binding appellate precedent" must be in-circuit precedent). The question remains whether the agents' reliance on *Knotts* and *Karo* was "objectively reasonable." *Davis*, 131 S. Ct. at 2428. We believe it was. Although the underlying facts in the cases differed—which will nearly always be true—the rationale underpinning the Supreme Court's decisions in *Knotts* and *Karo* clearly authorized the agents' conduct.

For a law enforcement officer's conduct to fall under the ambit of *Davis*, a court must answer in the affirmative that he or she has "conduct[ed] a search [or seizure] in objectively reasonable reliance on binding judicial precedent." *Id.* If that

18

is the case, this "absence of police culpability dooms" motions to suppress evidence gathered pursuant to an allegedly illegal search or seizure. *Id.* The concept of "objectively reasonable reliance" for good faith purposes has been in practice since long before *Davis* was decided and requires answering "whether a reasonably well trained officer would have known that [a] search was illegal . . . . [under] all of the circumstances . . . ." *Leon*, 468 U.S. at 922 n.23; *see also Herring*, 555 U.S. at 142 (noting that case law often refers to "objectively reasonable reliance" as "good faith"). The "circumstance" at the forefront of *Davis'* analysis is the existence of binding appellate precedent, and the dispositive inquiry is whether reliance upon it is "objectively reasonable." *Davis*, 131 S. Ct. at 2428.

As a threshold matter, we note that our inquiry is two-fold. The agents magnetically attached a battery-operated GPS onto the undercarriage of Harry Katzin's van and tracked its movements for two days. *Jones* analyzed this kind of conduct as a singular act. 132 S. Ct. at 949 (installation of GPS and its use to track vehicle are a search). However, prior to *Jones*, GPS or GPS-like surveillance was, for Fourth Amendment purposes, often treated as two distinct acts: (1) installation of the surveillance device, and (2) use of the device to track suspects' movements. *See, e.g.*, *Karo*, 468 U.S. at 711–13 (analyzing Fourth Amendment implications of beeper installation); *id.* at 713–18 (analyzing Fourth Amendment implications of beeper surveillance); *Knotts*, 460 U.S. at 279 n.** (granting certiorari on Fourth Amendment implications of beeper use, but passing on installation); *United States v. Pineda-Moreno*, 591 F.3d 1212, 1215–16 (9th Cir. 2010) (analyzing GPS installation separately from use), *vacated*, 132 S. Ct. 1533 (2012), *remanded to* 688 F.3d

19

1087 (9th Cir. 2012). Accordingly, we analyze the reasonableness of the agents' reliance upon binding appellate precedent under *Davis* with respect to both of these Fourth Amendment acts.

It was objectively reasonable for the agents to rely upon *Karo* in concluding that the warrantless installation of the GPS device was legal. In *Karo*, an agent with the Drug Enforcement Agency ("DEA") learned that James Karo and others had ordered, for use in cocaine smuggling, fifty gallons of ether from a government informant. 468 U.S. at 708. With the informant's consent, the Government substituted one of the informant's cans of ether with its own can, which contained a beeper. *Id.* Karo picked up the ether and took the "bugged" can into his car. *Id.* For over four months, DEA agents intermittently monitored the beeper to determine the location of the can. *Id.* at 708–10. The Government had obtained a court order authorizing this conduct, but it was subsequently invalidated, and, on appeal, the Government did not challenge its invalidation. *Id.* at 708, 710. Thus, when the case reached the Supreme Court, it presented the question whether the beeper's warrantless installation was legal. *Id.* at 711.

The Supreme Court affirmed the warrantless installation of the beeper, holding that it infringed no Fourth Amendment rights. *Id.* at 713. It reasoned that the transfer to Karo of the can containing the unmonitored beeper was not a search because the transfer conveyed no information, and therefore infringed no privacy interest. *Id.* at 712. Nor was the transfer a seizure despite the "technical trespass on the space occupied by the beeper," which the Court admitted was an "unknown and unwanted foreign object." *Id.* In so holding,

20

the Court broadly discredited the relevance of trespass in the context of electronic surveillance of vehicles: "[A] physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated, . . . for an actual trespass is neither necessary nor sufficient to establish a constitutional violation." *Id.* at 712–13.

The magnetic attachment of an unmonitored GPS unit onto the exterior of Harry Katzin's vehicle, like the mere transfer of a can containing an unmonitored beeper, did not convey any information. It would have been objectively reasonable for a law enforcement officer to conclude, prior to *Jones* and in reliance on *Karo*, that such conduct was not a search because it infringed no privacy interest. The same result applies to the "trespass" of the GPS device (also an "unknown and unwanted foreign object") upon Harry Katzin's vehicle. It would have been objectively reasonable for a law enforcement officer to conclude that *Karo*'s sweeping rejection of the trespass theory applied not only the DEA agents' elaborate ruse therein, but also to the unremarkable strategy of magnetically attaching a battery-operated GPS unit onto the exterior of a vehicle. In sum, although the facts of this case differ from *Karo*'s, the Supreme Court's rationale was broad enough to embrace the agents' conduct, and their reliance on this binding appellate precedent was objectively reasonable under *Davis*.

It was also objectively reasonable for the agents to rely upon *Knotts* and *Karo* in concluding that the warrantless monitoring of the GPS device was legal. In *Knotts*, like *Karo*, law enforcement arranged for a suspect to voluntarily take into his vehicle a container that, unbeknownst to him, contained a beeper. 460 U.S. at 278. The police thereby

monitored his travels on public roads. *Id.* The Supreme Court rejected the defendant's Fourth Amendment challenge to the surveillance, holding that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id.* at 281; *see also Karo*, 468 U.S. at 713–16, 721 (reaffirming *Knotts* but clarifying that monitoring beeper inside private residence violates Fourth Amendment due to reasonable expectation of privacy enjoyed therein). This is so because a traveler on public streets "voluntarily convey[s]" to any observer the "particular roads" over which he travels, his "particular direction," any stops he makes, and his "final destination." 460 U.S. at 281–82. The Government's surveillance "amounted principally" to legal conduct: physically following a suspect on public roads. *Id.* at 281. The beeper's use changed little because "[n]othing in the Fourth Amendment prohibited the police from augmenting [their] sensory faculties . . . with such enhancement as science and technology afforded them in this case." *Id.* at 282.

With respect to surveillance, the agents here engaged in nearly identical conduct to that authorized in *Knotts*. Appellees "voluntarily conveyed" their travels over public roads and the information gathered by the GPS device was indistinguishable from that which physical surveillance would have revealed. *See id.* at 281–82. Again, the breadth of the Supreme Court's rationale in *Knotts* and *Karo* encompasses the agents' conduct, and we conclude that reliance upon this binding appellate precedent was objectively reasonable under *Davis*. In so concluding, we join a number of our sister circuits in deciding that, for the purposes of the good faith inquiry as applied to these facts, the technological distinctions between the beepers of yesteryear and the GPS device used

22

herein are irrelevant. *See Aguiar*, 737 F.3d at 255, 261 (deciding that beeper used in *Knotts* was "sufficiently similar" to GPS device employed for approximately six months); *United States v. Sparks*, 711 F.3d 58, 66 (1st Cir. 2013) (concluding that "*Knotts* clearly authorized" law enforcement's use, for eleven days, of GPS device instead of beeper); *see also United States v. Fisher*, 745 F.3d 200, 205 (6th Cir. 2014) (concluding that in-circuit beeper cases were binding appellate precedent for "sporadic[]" GPS use); *United States v. Andres*, 703 F.3d 828, 835 (5th Cir. 2013) (same, for approximately two-day use).

We acknowledge, of course, that these cases are not factually identical to the agents' conduct. The agents monitored Harry Katzin's van for two days by GPS, not beeper. They clandestinely installed a battery-operated GPS by magnetically attaching it onto the undercarriage of his van rather than clandestinely tricking him into unwittingly taking the GPS device into his vehicle. Otherwise their conduct echoed that in *Knotts* and *Karo*. No two cases will be factually identical. While the underlying facts of the cases are obviously relevant to determining whether reliance is objectively reasonable, the question is not answered simply by mechanically comparing the facts of cases and tallying their similarities and differences. Rather, *Davis*' inquiry involves a holistic examination of whether a reasonable officer would believe in good faith that binding appellate precedent authorized certain conduct, which is a scenario-specific way of asking the broader question of whether the officer "act[ed] with an objectively 'reasonable good-faith belief' that [his] conduct [was] lawful." *Davis*, 131 S. Ct. at 2427 (quoting *Leon*, 468 U.S. at 909).

23

Undoubtedly, certain language in *Davis* invites a narrow reading, but we are not persuaded this interpretation is true to *Davis'* holding. For instance, *Davis* found exclusion inappropriate where "binding appellate precedent specifically *authorize*[*d*] a particular police practice." *Id.* at 2429. We construe, *arguendo*, this language narrowly to mean that the relied-upon case must affirmatively authorize the precise conduct at issue in the case under consideration. Stated as a syllogism, if binding appellate precedent specifically authorizes the precise conduct under consideration, then it will likely be binding appellate precedent upon which police can reasonably rely under *Davis*. However, this does not make the reverse syllogism true, namely, that if a case is binding appellate precedent under *Davis*, then it must specifically authorize the precise conduct under consideration. *Davis'* holding is broader: "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Id.* While reliance is likely reasonable when the precise conduct under consideration has been affirmatively authorized by binding appellate precedent, it may be no less reasonable when the conduct under consideration clearly falls well within rationale espoused in binding appellate precedent, which authorizes nearly identical conduct.

Accordingly, what is far more important to our conclusion is that, despite these few dissimilarities, the agents' nearly identical conduct fits squarely within the rationale of these decisions. We, therefore, believe that, at the time of the conduct at issue here, *Knotts* and *Karo* were binding appellate precedent, which could reasonably be relied on, under *Davis*. At least one other circuit has held so and explicitly rejected the contention that binding appellate

24

precedent must be "(1) within the Circuit and (2) specific to the facts at hand." *Aguiar*, 737 F.3d at 260–61 (holding that, before *Jones*, *Knotts* and *Karo* were binding appellate precedent under *Davis* for purposes of GPS installation and surveillance of a vehicle on public roads); *see also United States v. Brown*, 744 F.3d 474, 478 (7th Cir. 2014) (*Knotts* and *Karo* are binding appellate precedent for purposes of consensual GPS installation and subsequent surveillance).

> *2.* *Suppression is inappropriate because the agents acted under an objectively reasonable good faith belief that their conduct was lawful.*

>> *a.* *The alleged inapplicability of* Davis *does not control the issue.*

Alternatively, even if we were to accept Appellees' argument that factual dissimilarities disqualify *Knotts* and *Karo* from being "binding appellate precedent" which could reasonably be relied on under *Davis*, our inquiry would not end there. In advancing their contrary position, the District Court and Appellees improperly elevate *Davis*' holding above the general good faith analysis from whence it came. *Davis* is but one application of the good faith exception that applies when police "conduct a search in objectively reasonable reliance on binding judicial precedent." *Davis*, 131 S. Ct. at 2428. Undoubtedly, *Davis* is the most analogous Supreme Court decision to the instant circumstances. However, even if *Davis* did not mandate the application of the good faith exception, we can still apply the exception for another good reason. *Cf. United States v. Knights*, 534 U.S. 112, 117 (2001) (rejecting the "dubious logic . . . that an opinion upholding the constitutionality of a particular search implicitly holds

25

unconstitutional any search that is not like it"). The whole of our task is not to determine whether *Davis* applies, nor to "extend" either the good faith exception or *Davis'* holding. Even where *Davis* does not control, it is our duty to consider the totality of the circumstances to answer the "objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal."[9] *Leon*, 468 U.S. at 906–07, 922 n.23 (noting that exclusion inquiries "*must* be resolved by weighing the costs and benefits of [suppression]" (emphasis added)). To exclude evidence simply because law enforcement fell short of relying on binding appellate precedent would impermissibly exceed the Supreme Court's mandate that suppression should occur in only "unusual" circumstances: when it "further[s] the

---

[9] The District Court noted that the Supreme Court's good faith decisions generally involved reliance on some "unequivocally binding" authority, which does not include non-binding case law. *Katzin*, 2012 WL 1646894, at \*9; *see also supra* note 7. However, in the Supreme Court's many enunciations of the governing standard, it has never made such authority a condition precedent to applying the good faith exception. *See, e.g.*, *Herring*, 555 U.S. at 137 (noting that suppression "turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct"); *Evans*, 514 U.S. at 13–14 (suppression appropriate "only if the remedial objectives of the rule are thought most efficaciously served"); *Leon*, 468 U.S. at 918 (good faith exception requires "objectively reasonable belief that . . . conduct did not violate the Fourth Amendment"). We do no more than apply the good faith exception as articulated by the Supreme Court.

purposes of the exclusionary rule." *Id.* at 918; *see also Duka*, 671 F.3d at 346.

*Davis* supports this conclusion. In reaching its holding, *Davis* reiterates the analytical steps for evaluating suppression challenges. 131 S. Ct. at 2426–28. For example, we must limit operation of the exclusionary rule "to situations in which [its] purpose," deterring future Fourth Amendment violations, is "most efficaciously served." *Id.* at 2426 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). Our analysis must account for both "[r]eal deterrent value" and "substantial social costs," and our inquiry must focus on the "flagrancy of the police misconduct" at issue. *Id.* at 2427 (quoting *Leon*, 468 U.S. at 907, 911). Only when, after a "rigorous weighing," we conclude that "the deterrence benefits of suppression . . . outweigh its heavy costs," is exclusion appropriate. *Id.* Importantly, we must be prepared to "appl[y] this 'good-faith' exception across a range of cases."[10] *Id.* at 2428.

---

[10] Moreover, we note that Justice Sotomayor understood *Davis* explicitly to leave open the question "whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled." *Davis*, 131 S. Ct. at 2435 (Sotomayor, J., concurring). Similarly, Justice Breyer did not read *Davis* to limit the good faith exception only to "binding appellate precedent." *Id.* at 2439 (Breyer, J., dissenting) (arguing that culpability rationale could similarly excuse as good faith a search which an officer "believes complies with the Constitution but which . . . falls just outside the Fourth Amendment's bounds [or] where circuit precedent is simply suggestive rather than 'binding,'

*Davis* did not begin, nor end, with binding appellate precedent. Rather, binding appellate precedent informed—and ultimately determined—the Supreme Court's greater inquiry: whether the officers' conduct was deliberate and culpable enough that application of the exclusionary rule would "yield meaningfu[l] deterrence," and "be worth the price paid by the justice system." *Id.* at 2428 (alteration in original) (quoting *Herring*, 555 U.S. at 144) (internal quotation marks omitted). We must conduct the same analysis on the facts before us, even in the absence of binding appellate precedent.[11]

The District Court acknowledged the argument that the "general good faith exception language" could permit an "individualized determination" of whether the agents'

where it only describes how to treat roughly analogous instances, or where it just does not exist").

[11] Appellees' warning not to "fabricate" a new good faith ground exemplifies this misreading of *Davis*. (Appellee *En Banc* Br. at 4.) The *Davis* Court did not "fabricate" binding appellate precedent as a ground for applying the good faith exception. The facts involved binding appellate precedent, but the *ground* for applying the good faith exception was—as it has been since *Leon*—that the deterrence rationale was unsatisfied. *Davis*, 131 S. Ct. at 2428–29 (noting the "absence of police culpability" and that excluding evidence would deter only "objectively reasonable law enforcement activity" (quoting *Leon*, 468 U.S. at 919)). The factual circumstances before us differ, but we ground our application of the good faith exception in the same time-tested considerations.

conduct was objectively reasonable. *Katzin*, 2012 WL 1646894, at *8. This determination would have been properly informed by its conclusion that the agents' inadvertent Fourth Amendment violation was neither "calculated" nor the result of a "deliberately cavalier or casual" attitude toward Appellees' Fourth Amendment rights, and that the agents were likely "surprise[d]" by *Jones*." *Id.* at *10 n.15; *see also Davis*, 131 S. Ct. at 2429 (noting that the Supreme Court has "'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct" (quoting *Herring*, 555 U.S. at 144)). However, the District Court declined to apply the good faith exception on the theory that doing so would implicate or "extend" the "strict *Davis* holding." *Id.* at *9–10. This conclusion prevented the District Court from answering, as was its duty, the "objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal . . . . [under] all of the circumstances . . . ." *Leon*, 468 U.S. at 922 n.23.

### b.    The Legal Landscape

In applying the good faith exception analysis to the agents' conduct, we initially address the precise conduct at issue and the legal landscape at the time the agents acted. The agents magnetically attached a battery-operated GPS onto the undercarriage of Harry Katzin's van and tracked its movements for two days. As noted above, we analyze the reasonableness of the agents' conduct as would a pre-*Jones* court, namely, by separately considering installation and surveillance. *E.g.*, *Karo*, 468 U.S. at 711–18.

Application of the good faith exception turns on whether the agents, at the time they acted, would have or should have known their installation of the GPS and their subsequent monitoring of Harry Katzin's vehicle were unconstitutional. *See Krull*, 480 U.S. at 348–49. Relevant to this determination are the Supreme Court's case law dealing with electronic surveillance and general searches of automobiles, subsequent treatment of GPS or GPS-like surveillance across the federal courts, and other considerations.

## *i.* Knotts *and* Karo

Until *Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court's primary Fourth Amendment inquiry was whether the Government committed a physical trespass. *See, e.g.*, *id.* at 352 (noting that the absence of trespass was once "thought to foreclose further Fourth Amendment inquiry"). *Katz* changed this, famously declaring that "the Fourth Amendment protects people, not places." *Id.* at 351, 353 ("[T]he reach of [the Fourth] Amendment cannot turn upon the presence or absence of a physical intrusion . . . . [T]he 'trespass' doctrine . . . can no longer be regarded as controlling."). Subsequently, *Katz* was widely regarded as having jettisoned reliance on physical trespass in resolving Fourth Amendment challenges. *See, e.g.*, *United States v. Santillo*, 507 F.2d 629, 632 (3d Cir. 1975) (noting that the "trespassory concepts" relied upon in earlier Fourth Amendment cases have been "discredited"). After *Katz*, the dominant Fourth Amendment inquiry became whether the Government had intruded upon a person's reasonable expectation of privacy. *See Katz*, 389 U.S. at 360 (Harlan, J., concurring); *see also, e.g.*, *Rakas v. Illinois*, 439 U.S. 128,

30

143 (1978) (noting that one's "capacity" to invoke Fourth Amendment protections depends upon whether one has a legitimate expectation of privacy, not a property right, in the invaded place).

In *Knotts* and *Karo*, the Supreme Court applied this rationale to electronic surveillance of vehicles. We incorporate our earlier discussion of these cases, pausing only to reiterate *Knotts'* conclusion that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another," 460 U.S. at 281, as well as *Karo*'s broad rejection of the trespass theory in the context of electronic surveillance of vehicles: "[A] physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated, . . . for an actual trespass is neither necessary nor sufficient to establish a constitutional violation." 468 U.S. at 712–13.

Also relevant to the installation question are the Supreme Court's conclusions that persons do not enjoy a reasonable expectation of privacy in the exterior of their vehicles. *New York v. Class*, 475 U.S. 106, 114 (1986) ("The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'"); *Cardwell v. Lewis*, 417 U.S. 583, 591–92 (1974) (plurality opinion) (no privacy interest infringed where search examined tire on wheel and took paint scrapings from exterior of vehicle in public parking lot).

Thus, at bottom, before *Jones*, *Knotts* and *Karo* established that no Fourth Amendment search occurred where officers used beeper-based electronics to monitor an

automobile's movements on public roads because a person has no reasonable expectation of privacy with regard to that information. Additionally, the rationale they espoused informed the federal appeals courts' subsequent treatment of direct installation of a GPS device onto the exterior of a vehicle.

### ii. Out-of-Circuit Decisions

After *Knotts* and *Karo*, what resulted was a nearly uniform consensus across the federal courts of appeals that addressed the issue that the installation and subsequent use of a GPS or GPS-like device was not a search, or, at most, was a search but did not require a warrant. *See, e.g.*, *United States v. Marquez*, 605 F.3d 604, 609–10 (8th Cir. 2010) (reasoning that GPS installation and use requires only reasonable suspicion, since monitoring on public roads is not a search); *Pineda-Moreno*, 591 F.3d at 1215–16 (holding that mobile tracking device installation and use was not a search); *United States v. Garcia*, 474 F.3d 994, 997 (7th Cir. 2007) (holding that GPS installation and use was not a search), *abrogation recognized by United States v. Brown*, 744 F.3d 474 (7th Cir. 2014); *United States v. McIver*, 186 F.3d 1119, 1126–27 (9th Cir. 1999) (holding that GPS installation was not a search); *see also United States v. Michael*, 645 F.2d 252, 256–58 (5th Cir. 1981) (en banc) (holding that beeper installation and use requires only reasonable suspicion, since monitoring on public roads is not a search).[12]

---

[12] *Michael* was also Eleventh Circuit law. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (Fifth Circuit decisions before October 1, 1981 bind Eleventh Circuit). *Michael* was decided May 11, 1981. 645 F.2d at 252.

32

The lone dissenting voice was *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), decided four months prior to the agents' conduct here. *Maynard* (which became *Jones* on appeal to the Supreme Court) held that prolonged GPS surveillance of a vehicle "24 hours a day for four weeks" was a Fourth Amendment search because it invaded the defendant's reasonable expectation of privacy. *Id.* at 555. The D.C. Circuit reasoned that *Knotts* held only that a person travelling by vehicle on public roads had no reasonable expectation of privacy in his movements, not that "such a person has no reasonable expectation of privacy in his movements whatsoever, world without end." *Id.* at 557. *Maynard* thus focused on the quality and quantity of information gathered during the extended surveillance. *Id.* at 562 (noting that prolonged surveillance, unlike short-term surveillance, exposes "what a person does repeatedly, what he does not do, and what he does ensemble," thereby revealing more information than an isolated trip). It reasoned that the defendant's movements were "not actually exposed to the public because the likelihood a stranger would observe all those movements is not just remote, it is essentially nil." *Id.* at 560.

Thus, at the time the agents acted, in addition to the "beeper" authority of *Knotts* and *Karo*, three circuit courts expressly approved their use of a GPS or GPS-like device, and the lone dissenting voice involved surveillance of a far longer duration.

### iii. AUSA Consultation

33

Finally, the agents consulted with, and received approval from, an AUSA on their proposed conduct. It was DOJ policy at the time that a warrant was not required to install a battery-powered GPS on a vehicle parked on a public street and to surveil it on public roads. We have previously considered reliance on government attorneys in our good faith calculus and concluded that, based upon it in combination with other factors, "[a] reasonable officer would . . . have confidence in [a search's] validity."[13] *United States v. Tracey*, 597 F.3d 140, 153 (3d Cir. 2010); *see also United States v. Fama*, 758 F.2d 834, 837 (2d Cir. 1985) (same).

*Jones* fundamentally altered this legal landscape by reviving—after a forty-five year hibernation—the Supreme Court's prior trespass theory. 132 S. Ct. at 952 (declaring that reasonable expectation of privacy inquiry did not substitute for "common-law trespassory test"). As the Ninth Circuit recently stated: "The agents in *Jones* labored under the misconception that the 'reasonable expectation of privacy' test exclusively marked the [Fourth] Amendment's boundaries. Cases fostering that impression were ubiquitous." *United States v. Thomas*, 726 F.3d 1086, 1094 n.8 (9th Cir. 2013) (citation omitted) (citing numerous Supreme Court cases).

---

[13] At oral argument before the original panel, counsel for Appellee Mark Katzin conceded that we may properly consider the AUSA consultation in the totality of circumstances informing our good faith analysis. Transcript of Oral Argument at 52, *United States v. Katzin*, 732 F.3d 187 (3d Cir. 2013), *vacated by United States v. Katzin*, No. 12-2548, 2013 WL 7033666 (3d Cir. Dec. 12, 2013) (No. 12-2548).

With this legal landscape in mind, we turn now to our application of the good faith exception to the exclusionary rule.

> ### c. Applying the Good Faith Exception

To reiterate, the exclusionary rule is a prudential doctrine designed solely to deter future Fourth Amendment violations. *Davis*, 131 S. Ct. at 2426. Marginal deterrence is, however, insufficient for suppression; rather, deterrence must be "appreciable," *Leon*, 468 U.S. at 909, and outweigh the heavy social costs of suppressing reliable, probative evidence, *Davis*, 131 S. Ct. at 2427. This balancing act pivots upon the fulcrum of the "flagrancy of the police misconduct" at issue. *Id.* (quoting *Leon*, 468 U.S. at 911). Thus, "[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (quoting *Herring*, 555 U.S. at 144) (internal quotation marks omitted). However, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale loses much of its force and exclusion cannot pay its way." *Id.* at 2427–28 (quoting *Leon*, 468 U.S. at 907 n.6, 909, 919) (internal quotation marks omitted).

Accordingly, we must determine whether—on these particular facts—the agents acted with a good faith belief in the lawfulness of their conduct that was "objectively reasonable." *Id.* If so, suppression is unwarranted. If, on the other hand, the agents "had knowledge, or may properly be charged with knowledge, that the search was unconstitutional

35

under the Fourth Amendment," suppression is warranted. *Krull*, 480 U.S. at 348–49. When answering these questions, we consider "all of the circumstances" and confine our inquiry to the "objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal" in light of that constellation of circumstances. *Leon*, 468 U.S. at 922 n.23.

We conclude that when the agents acted, they did so upon an objectively reasonable good faith belief in the legality of their conduct, and that the good faith exception to the exclusionary rule therefore applies. The constellation of circumstances that appeared to authorize their conduct included well settled principles of Fourth Amendment law as articulated by the Supreme Court, a near-unanimity of circuit courts applying these principles to the same conduct, and the advice of an AUSA pursuant to a DOJ-wide policy. Given this panoply of authority, we cannot say that a "reasonably well trained officer would have known that the search was illegal," *id.,* nor that the agents acted with "deliberate, reckless, or grossly negligent disregard for [Appellees'] Fourth Amendment rights," *Davis*, 131 S. Ct. at 2427 (quoting *Herring*, 555 U.S. at 144) (internal quotation marks omitted). Thus, suppression is inappropriate because it would not result in deterrence appreciable enough to outweigh the significant social costs of suppressing reliable, probative evidence, upon which the Government's entire case against Appellees turns. *See Leon*, 468 U.S. at 909.

### *i.* Knotts *and* Karo

*Knotts* and *Karo* are seminal cases on the intersection of electronic surveillance of vehicles and the Fourth

Amendment. Before *Jones*, their conclusion that the Fourth Amendment was not implicated by the installation and use of a beeper to surveil vehicles on public thoroughfares, and the rationale that supported it, was hornbook law. *See, e.g.*, *Aguiar*, 737 F.3d at 261 ("*Karo*'s brushing off of the potential trespass fits logically with earlier Supreme Court decisions concluding that 'the physical characteristics of an automobile and its use result in a lessened expectation of privacy therein.'" (quoting *Class*, 475 U.S. at 112)); *Sparks*, 711 F.3d at 67 ("*Knotts* was widely and reasonably understood to stand for the proposition that the Fourth Amendment simply was not implicated by electronic surveillance of public automotive movements . . . ."). The agents would have been objectively reasonable to conclude that monitoring Harry Katzin's van was constitutional, in large part, because it fell squarely within *Knotts* and *Karo*'s well-accepted rationale. Their targets were "person[s] travelling in an automobile on public thoroughfares," who had "no reasonable expectation of privacy in [their] movements from one place to another." *Knotts*, 460 U.S. at 281. It is undisputed that Appellees "voluntarily convey[ed]" to any observer the "particular roads" over which they traveled, their "particular direction," their stops, and their "final destination." *Id.* at 281–82. At no time did the GPS permit the agents to monitor inside "a private residence" or other area "not open to visual surveillance." *Karo*, 468 U.S. at 714, 721.

Additionally, the agents would have been objectively reasonable to believe that installing the GPS device implicated no Fourth Amendment rights. The Supreme Court had repeatedly stated that persons do not enjoy a reasonable expectation of privacy in the exterior of their vehicles. *Class*, 475 U.S. at 114; *see also Cardwell*, 417 U.S. at 591. It was

37

also objectively reasonable for the agents to believe that installing a GPS was safe from a trespass challenge. *Katz* clearly stated that Fourth Amendment inquiries did not "turn upon the presence or absence of a physical intrusion." 389 U.S. at 353. The trespass doctrine had been "discredited." *Santillo*, 507 F.2d at 632.

The agents also benefitted from Supreme Court precedent addressing trespass in the context of electronic surveillance of vehicles on public roads. Although *Karo* did not address direct installation, its renunciation of the trespass theory was broad enough for agents reasonably to conclude that the installation was "only marginally relevant" to Appellees' Fourth Amendment rights and alone was "neither necessary nor sufficient to establish a constitutional violation." 468 U.S. at 712–13. They could have reasonably believed that the only constitutionally significant act they engaged in was monitoring. *Id.* at 713 (rejecting trespass theory and noting that privacy violation, if any, was "occasioned by the monitoring of the beeper"). And, as discussed, the agents had no reason to believe the monitoring was illegal.

### ii. Out-of-Circuit Decisions

The agents' conduct also conformed to practices authorized by a "uniform treatment" of "continuous judicial approval" of warrantless GPS installation and use across the federal courts. *See Peltier*, 422 U.S. at 540–42 & n.8 (holding exclusionary rule inapplicable where illegal search was conducted in good faith reliance on, in part, holdings and

dicta of various courts of appeals).[14] Specifically, when the agents acted, the Seventh,[15] Eighth,[16] and Ninth[17] Circuits had all held that the installation of GPS or GPS-like devices upon the exterior of vehicles and their subsequent monitoring either was not a search or, at most, was a search but did not require a warrant.[18] Their rationales were based on the same Supreme Court precedents we outline above, particularly *Knotts*.

---

[14] Although *Peltier* was applying the "old retroactivity regime" of *Linkletter v. Walker*, 381 U.S. 618 (1965), *Leon* "explicitly relied on *Peltier* and imported its reasoning into the good-faith inquiry." *Davis*, 131 S. Ct. at 2431–32.

[15] *Garcia*, 474 F.3d at 997–98.

[16] *Marquez*, 605 F.3d at 609–10.

[17] *Pineda-Moreno*, 591 F.3d at 1215–17; *McIver*, 186 F.3d at 1126–27.

[18] The D.C. Circuit in *Maynard* broke from this consensus and held that prolonged GPS surveillance of the defendant's vehicle "24 hours a day for four weeks" was a Fourth Amendment search. 615 F.3d at 555. The D.C. Circuit explicitly tailored its holding to the fact that surveillance of the defendant lasted for a month. *Id.* at 558, 560 ("Applying the foregoing analysis to the present facts, we hold the whole of a person's movements over the course of a month is not actually exposed to the public . . . ."). It also relied exclusively on a reasonable expectation of privacy rationale, giving no hint at *Jones*' revival of the trespass theory. *Id.* at 559–61. We cannot conclude that from this sole departure from the consensus of the courts of appeals "a reasonably well trained officer would [or should] have known" that the more limited GPS surveillance in this case was illegal. *Leon*, 468 U.S. at 922 n.23.

By considering these non-binding decisions in our good faith analysis, we do no more than did the Supreme Court in *Peltier*. There, the Court considered the "constitutional norm" established by the courts of appeals when determining whether an officer "had knowledge, or [could] properly be charged with knowledge, that [a] search was unconstitutional under the Fourth Amendment." *Id.* at 542 ("[U]nless we are to hold that parties may not reasonably rely upon any legal pronouncement emanating from sources other than this Court, we cannot regard as blameworthy those parties who conform their conduct to the prevailing . . . constitutional norm.").[19]

### iii. AUSA Consultation

Finally, the agents' consultation with the AUSA also supports our conclusion that a reasonable agent would have believed in good faith that the installation and surveillance of Harry Katzin's vehicle was legal. Of course, the AUSA approved their conduct. But more importantly, the AUSA's advice was given pursuant to a DOJ-wide policy—presumably based upon the legal landscape we describe above—that the agents' conduct did not require a warrant.

---

[19] This Court has also previously noted—albeit in limited ways—supportive out-of-circuit decisions in its good faith analyses. *See, Pavulak*, 700 F.3d at 664 (holding that officer relied in good faith upon warrant and noting that "the affidavit's allegations would have been sufficient in the Eighth Circuit at the time"); *Duka*, 671 F.3d at 347 n.12 (concluding that objective reasonableness of reliance on statute was "bolstered" by out-of-circuit decisions reviewing particular provision and declaring it constitutional).

Prosecutors are, of course, not "neutral judicial officers." *Leon*, 468 U.S. at 917. We do not place undue weight on this factor, but we have previously considered it in our good faith analysis. *Tracey*, 597 F.3d at 153; *see also United States v. Otero*, 563 F.3d 1127, 1134–35 (10th Cir. 2009).

In light of the aforementioned legal landscape, when the agents installed the GPS device onto the undercarriage of Harry Katzin's vehicle, and then used that device to monitor his vehicle's movements on public thoroughfares for two days, we believe those agents exhibited "an objectively 'reasonable good-faith belief' that their conduct [was] lawful." *Davis*, 131 S. Ct. at 2427 (quoting *Leon*, 468 U.S. at 909). Given the panoply of authority authorizing their actions, we cannot conclude that a "reasonably well trained officer would have known that the search was illegal," *Leon*, 468 U.S. at 922 n.23, nor that the agents acted with a "deliberate, reckless, or grossly negligent disregard for [Appellees'] Fourth Amendment rights," *Davis*, 131 S. Ct. at 2427 (quoting *Herring*, 555 U.S. at 144) (internal quotation marks omitted). Prior to *Jones*' unforeseeable revival of the "discredited" trespass theory, *Santillo*, 507 F.2d at 632, a reasonable police officer would have concluded that the agents' conduct did not require a warrant. Suppression in this case would only deter "conscientious police work." *Id.* at 2429. Accordingly, suppression of the evidence discovered as a result of the agents' conduct would not "outweigh the resulting costs," and "exclusion cannot 'pay its way.'" *Id.* at 2427–28 (quoting *Leon*, 468 U.S. at 907 n.6).[20]

---

[20] Our sister circuits' complementary conclusions support this result. *See Brown*, 744 F.3d at 478 (*Knotts* and *Karo* are binding appellate precedent for purposes of consensual GPS

### d. Appellees' Arguments

Appellees argue that excluding the evidence against them would achieve appreciable deterrence because it would prevent investigators and prosecutors from "engaging in overly aggressive readings of non-binding authority" and deter law enforcement from "'act[ing] in a constitutionally

installation and subsequent surveillance); *Aguiar*, 737 F.3d at 261 (same, for purposes of nonconsensual installation and subsequent surveillance); *Sparks*, 711 F.3d at 67 (*Knotts* is binding appellate precedent where police install GPS and surveil vehicle's movements). Although the Seventh Circuit left open the question of *non*consensual GPS installation, it strongly suggested that applying the good faith exception would be appropriate based upon out-of-circuit authority. *Brown*, 744 F.3d at 478 (doubting deterrent effect of prohibiting police from relying on out-of-circuit authority "just because the circuit . . . lacks its own precedent"). We also note that the First Circuit did not clearly distinguish where its reliance on *Knotts* ended and reliance on its own precedent began. *See Sparks*, 711 F.3d at 67 (relying on both *Knotts* and *United States v. Moore*, 562 F.2d 106 (1st Cir. 1977), *abrogation recognized by United States v. Oladosu*, 744 F.3d 36 (1st Cir. 2014)). However, it relied on *Knotts* for the same reasons we highlight. *See id.* at 66–67 (declaring that *Knotts* was "widely and reasonably understood" to mean electronic surveillance of vehicles on public roads did not implicate Fourth Amendment and that it "clearly authorized" use of GPS in place of beeper). Finally, as noted earlier, our sister circuits have routinely concluded, as we do on these facts, that there is no relevant distinction between beepers and GPS devices for good faith purposes.

reckless fashion' by taking constitutional inquiries into their own hands." (Appellee *En Banc* Br. at 5 (quoting *Katzin*, 732 F.3d at 212).) To so hold would lead to the same result as the District Court's erroneous application of *Davis*: the good faith exception would not apply unless our own Court had established binding appellate precedent directly on point and approving the officer's conduct. Put differently, all innocently (though later deemed illegally) gathered evidence would be excluded unless the police conduct discovering it was expressly permitted at the time the conduct occurred. But the purpose of the exclusionary rule is to deter "wrongful police conduct." *Herring*, 555 U.S. at 137. And exclusion is only appropriate when doing so "most efficaciously serve[s]" that purpose. *Calandra*, 414 U.S. at 348. The mere act of deciding that conduct is lawful based upon a "constitutional norm" rather than binding appellate precedent is unlike the highly culpable conduct that helped establish the exclusionary rule. *See, e.g.*, *Herring*, 555 U.S. at 143 (listing cases and noting that "the abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional").

No doubt, sometimes officers' reliance on non-binding authorities will fall short of an "objectively reasonable" good faith belief in the legality of their conduct. Suppression may then be appropriate to deter such reliance. It is equally elementary that close cases will be difficult.[21] But in many

---

[21] We are unpersuaded by Appellees' warning that our holding will require a "complicated judgment about whether *non-binding* case law is sufficiently 'settled' and 'persuasive.'" (Appellee *En Banc* Br. at 6.) The Fourth Amendment routinely requires courts to make difficult

other cases, law enforcement will likely correctly conclude, based upon a panoply of non-binding authority establishing a "constitutional norm," *Peltier*, 422 U.S. at 542, that a particular police practice does not violate the Fourth Amendment. The value in deterring such conduct is low. Additionally, adopting such a bright-line rule may impermissibly avoid our duty to conduct in each case a "rigorous weighing" of suppression's costs and benefits, *Davis*, 131 S. Ct. at 2427, and to consider "all of the circumstances" to determine the "objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal," *Leon*, 468 U.S. at 922 n.23. We would also risk "generat[ing] disrespect for the law and administration of justice" by applying the exclusionary rule so indiscriminately. *Id.* at 908 (quoting *Stone*, 428 U.S. at 491).

Because such a bright-line rule would supplant the required balancing act, we would have to be confident that in every conceivable future case, the substantial costs of suppression would be outweighed by the value of deterring police from relying on a "constitutional norm" simply because it had yet to be expressly established by precedential opinion in the Third Circuit. We have no such confidence and Appellees do little to assuage our concerns. Appellees' good faith calculus conspicuously fails to confront the "cost" side of the equation, which they dismiss as "minimal." (Appellee *En Banc* Br. at 8.) However, the Supreme Court has routinely

---

determinations of reasonableness. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 383 (2007) (noting that the Fourth Amendment requires courts to "slosh . . . through the factbound morass of 'reasonableness'").

44

stated the opposite; the cost of suppression is "substantial," *Leon*, 468 U.S. at 907, because it often excludes "reliable, trustworthy evidence" of a defendant's guilt, "suppress[es] the truth and set[s] [a] criminal loose in the community without punishment," *Davis*, 131 S. Ct. at 2427. Here, by all appearances, the Government's evidence against Appellees is substantial, and it is uncontested that the Government would have no case without it. The costs of exclusion are high.

The boundaries of the good faith exception are a sufficient deterrent to the conduct Appellees find objectionable. Law enforcement personnel will either tread cautiously or risk suppression.[22] The legal authority relied upon must support an "objectively reasonable good faith belief" that specific conduct is constitutional. *Id.* (quoting *Leon*, 468 U.S. at 909) (internal quotation mark omitted). Consequently, nothing in our holding today conflicts with the Supreme Court's instructions to executive officers to "err on

---

[22] As the Supreme Court noted in *Leon*, "the possibility that illegally obtained evidence may be admitted in borderline cases is unlikely to encourage police instructors to pay less attention to fourth amendment limitations. . . . [nor] encourage officers to pay less attention to what they are taught, as the requirement that the officer act in 'good faith' is inconsistent with closing one's mind to the possibility of illegality." 468 U.S. at 919 n.20 (quoting Jerold Israel, *Criminal Procedure, the Burger Court, and the Legacy of the Warren Court*, 75 Mich. L. Rev. 1319, 1412–13 (1977)). The Supreme Court has also recognized the "increasing evidence that police forces across the United States take the constitutional rights of citizens seriously." *Hudson*, 547 U.S. at 599.

the side of constitutional behavior," *United States v. Johnson*, 457 U.S. 537, 561 (1982), and in "doubtful or marginal case[s]" to obtain a warrant, *Leon*, 468 U.S. at 914 (quoting *United States v. Ventresca*, 380 U.S. 102, 106 (1965)). We do not believe this case to be either doubtful or marginal.[23]

In any event, just because law enforcement officers may one day unreasonably rely on non-binding authority does not absolve us of our duty to decide whether, under these facts, the agents' conduct was "sufficiently deliberate" that deterrence will be effective and "sufficiently culpable" that deterrence outweighs the costs of suppression. *Herring*, 555 U.S. at 144. In this case neither standard is satisfied. Future decisions may reveal that applying the good faith exception to reliance on non-binding authority should be extremely rare, perhaps as rare as tectonic shifts in Fourth Amendment jurisprudence such as *Jones*. *See Davis*, 131 S. Ct. at 2433 (noting the infrequency with which the Supreme Court overrules its Fourth Amendment precedents). But that is a question for another day.

## III.   CONCLUSION

For the foregoing reasons, we reverse the order of the District Court suppressing the evidence discovered in Harry

---

[23] Appellees also argue that, under our holding, courts will "defer to 'adjuncts of the law enforcement team' on the difficult question of whether a particular legal issue is the subject of 'settled' and 'persuasive' law." (Appellee *En Banc* Br. at 7.) The good faith analysis is not deferential. That courts may be required to consider whether reliance on non-binding authority is objectively reasonable does not change the governing inquiry.

Katzin's van and remand for further proceedings consistent with this opinion.

GREENAWAY, JR., *Circuit Judge*, dissenting, joined by McKEE, *Chief Judge*, and AMBRO, FUENTES, and SMITH, *Circuit Judges.*

Once touted as a way to ensure that the rights of citizens are protected from overzealous law enforcement, today the exclusionary rule's very existence, long eroding, is in serious doubt. Since the inception of the exclusionary rule, critics have disputed its validity. In words often quoted, [then Judge] Cardozo questioned whether "[t]he criminal is to go free because the constable has blundered." *People v. Defore*, 150 N.E. 585, 587 (N.Y. 1926). Courts have given power to the words of the critics by using the good faith exception to chip away at the breadth of the rule. The majority, in its alternative holding, expands the good faith exception to the point of eviscerating the exclusionary rule altogether by failing to provide any cognizable limiting principle. Now, law enforcement shall be further emboldened knowing that the good faith exception will extricate officers from nearly any evidentiary conundrum.

Law enforcement violated Katzin's Fourth Amendment rights.[1] In this case, the only means by which

---

[1] That the GPS placed on Katzin's vehicle violated his Fourth Amendment rights was not argued before the Third Circuit en banc, as argument was restricted to the question of the applicability of good faith. Before a good faith analysis can proceed, there must first be a finding that a Fourth Amendment violation occurred. The majority downplays the significance of this requirement, noting that "we need not determine whether the agents' conduct was an unreasonable search because, even assuming so, we conclude that the good faith exception applies . . . ." Majority Op. at 10-11.

the evidence obtained through such a violation could be used against Katzin is through application of the good faith exception. To achieve this end, the majority argues that good faith applies, even without the existence of binding appellate precedent. What law enforcement did in this case was to "rely on precedent to resolve legal questions as to which '[r]easonable minds . . . may differ . . . .'" *United States v. Davis*, 598 F.3d 1259, 1267 (11th Cir. 2010), *aff'd*, 131 S. Ct. 2419 (2011) (quoting *United States v. Leon*, 468 U.S. 897, 914 (1984)). In such an instance, "the exclusionary rule is well-tailored to hold [law enforcement] accountable for their mistakes." *Id.* The majority disagrees with this proposition and instead gives free rein to law enforcement to interpret legal propositions without any consequence if and when they are wrong.

Law enforcement contends that they acted reasonably by consulting with their co-investigators at the U.S. Attorney's Office. However, what is missing here is neutral authorization of any sort for the conduct undertaken by the police. Consultation with the U.S. Attorney's Office is not a panacea for the constitutional issues raised here. *Katz v. United States*, 389 U.S. 347, 356 (1967) ("It is apparent that

However, simultaneously, the majority notes that "[a] panel of this Court *unanimously* affirmed the District Court's conclusions that the agents' conduct required a warrant and that all three brothers had standing." Majority Op. at 9. Here, the agents' conduct constituted an unreasonable search, and this finding is a predicate to any good faith analysis. *See, e.g.*, *Davis v. United States*, 131 S. Ct. 2419, 2428-29 (2011) (acknowledging the constitutional violation before proceeding to the good faith analysis).

the agents in this case acted with restraint. Yet the inescapable fact is that this restraint was imposed by the agents themselves, *not by a judicial officer*. They were not required, before commencing the search, to present their estimate of probable cause for detached scrutiny by a neutral magistrate. They were not compelled, during the conduct of the search itself, to observe precise limits established in advance by a specific court order. Nor were they directed, after the search had been completed, to notify the authorizing magistrate in detail of all that had been seized.") (emphasis added). Even if the majority believes that this neutral authorization requirement (which admittedly pre-dates the good faith exception) has been undercut by subsequent Supreme Court decisions, we are still required to follow it. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Neutral authorization for law enforcement's actions has been the hallmark of the good faith exception's application. Without this control, what is the fail-safe to preclude further erosion? I fear there is none. For these reasons, I respectfully dissent.

In its primary holding, the majority turns the rationale of *Davis* on its head and concludes that two disparate Supreme Court precedents—that the Government concedes do not constitute binding appellate precedent—now fit the bill.[2] How does the majority justify the creation of such a

---

[2] At oral argument, the Government stated that its position regarding *United States v. Knotts*, 460 U.S. 276 (1983) and

3

notion? Such a leap constitutes willful disregard of the critical distinctions between this case on the one hand and *United States v. Knotts*, 460 U.S. 276 (1983) and *United States v. Karo*, 468 U.S. 705 (1984) on the other. Further, this leap reveals the majority's true purpose: to accommodate the desires of law enforcement.

## I. Expansion of the Good Faith Exception

The majority's alternative holding, that good faith should apply even if it does not fit the *Davis* paradigm, is troubling. The essence of the majority's holding is that any time a course of conduct by the police, particularly regarding technological advancements, has not been tested or breaks new ground, law enforcement will be entitled to the good faith exception. [3] This directly contravenes one of the principles expounded in *Davis*: that evidence admitted pursuant to the good faith exception is so admitted because the police relied on binding appellate precedent that, as Justice Alito said in his majority opinion, "*specifically authorize*[*d* the] particular police practice . . . ." *Davis*, 131 S. Ct. at 2429 (emphasis added). Indeed, as Justice Sotomayor noted in her concurrence, *Davis* did not "present

---

*United States v. Karo*, 468 U.S. 705 (1984) is, "about one hair short of [binding appellate precedent]." Tr. of Oral Argument at 6, *United States v. Katzin*, − F.3d − (3d Cir. 2014) (en banc) (No. 12-2548).

[3] At oral argument, the Government acknowledged that it was asking for an expansion of the good faith exception, to which, with today's ruling, the majority has clearly acquiesced. *Id.* at 23.

the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled." *Id.* at 2435 (Sotomayor, J., concurring).[4]

I do not dispute the majority's contention that "*Davis* is but one application of the good faith exception that applies when police 'conduct a search in objectively reasonable reliance on binding judicial precedent.'" Majority Op. at 25 (quoting *Davis*, 131 S. Ct. at 2428). Instead, my point goes to the manner in which the good faith exception is being expanded. It has everything to do with neutral authorization and with the ultimate decision-making not being in the hands of law enforcement. This is what the framers envisioned

---

[4] The Eleventh Circuit's opinion in *Davis* was also explicit on this point: "[We refuse] to apply the exclusionary rule when the police have reasonably relied on *clear and well-settled* precedent. We stress, however, that our precedent on a given point must be *unequivocal* before we will suspend the exclusionary rule's operation." *Davis*, 598 F.3d at 1266 (citations omitted) (emphasis added); *see also United States v. Buford*, 632 F.3d 264, 276 n.9 (6th Cir. 2011) ("Like the Eleventh Circuit, we also 'stress, however, that our precedent on a given point must be unequivocal before we will suspend the exclusionary rule's operation.'" (quoting *Davis*, 598 F.3d at 1266)); *United States v. McCane*, 573 F.3d 1037, 1045 n.6 (10th Cir. 2009) (finding that the good faith exception applied because "Tenth Circuit jurisprudence supporting the search was settled. Thus, there was no risk that law enforcement officers would engage in the type of complex legal research and analysis better left to the judiciary and members of the bar").

when they wrote the Fourth Amendment requiring that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

Historically, the Supreme Court has held the good faith exception covers situations where law enforcement personnel have acted in objectively reasonable reliance on some seemingly immutable authority or information that justifies their course of action. *See, e.g.*, *United States v. Leon*, 468 U.S. 897 (1984) (later-invalidated warrant); *Massachusetts v. Sheppard*, 468 U.S. 981, 990 (1984) (exclusionary rule inapplicable when warrant is invalid due to judicial clerical error); *Illinois v. Krull*, 480 U.S. 340 (1987) (subsequently overturned statute); *Davis*, 131 S. Ct. 2419 (later-reversed binding appellate precedent); *Arizona v. Evans*, 514 U.S. 1 (1995) (undiscovered error in court-maintained database); *Herring v. United States*, 555 U.S. 135 (2009) (undiscovered error in police-maintained database).

It is clear from the line of good faith cases that the exception is limited to cases involving either: (a) non-deterrable, isolated mistakes, or (b) cases in which police officers rely upon a neutral third-party's authorization.[5] Such delineated exceptions allow us to hold fast to the constitutional guarantee of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Thus, "[i]t remains a cardinal principle that searches

---

[5] I limit my discussion to scenario (b) based on the facts of this case.

6

conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Harrison*, 689 F.3d 301, 306 (3d Cir. 2012) (internal quotation marks omitted). The majority's opinion, absent such a guiding principle, has now leant its imprimatur to the notion that even if law enforcement's conduct violates the Fourth Amendment, it is perfectly fine because the evidence can come in through good faith. The exception becomes the rule.

The majority argues that the purpose of the exclusionary rule is to deter wrongful conduct of law enforcement, and that here there is no wrongful conduct. As the Supreme Court has explained, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144; *Davis*, 131 S. Ct. at 2429 (cautioning courts not to discourage "the officer from doing his duty") (alteration and internal quotation marks omitted). The majority determines that acting on a good-faith mistake about the law, without seeking a warrant even when there was time to get one, is not conduct which should be deterred. But *Davis* itself suggests that it is proper for the exclusionary rule to "punish" such an "error." *Davis*, 131 S. Ct. at 2428.

Here, law enforcement personnel made a deliberate decision to forego securing a warrant before attaching a GPS device directly to a target vehicle in the absence of binding Fourth Amendment precedent authorizing such a practice. Indeed, the police embarked on a long-term surveillance project using technology that allowed them to monitor a

7

target vehicle's movements using only a laptop, all before either this Circuit or the Supreme Court had spoken on the constitutional propriety of such an endeavor. In an area without any guidance from the Supreme Court or from our Circuit, law enforcement and the prosecutors looked to our sister circuits to find the universe of case law that supported the most beneficial position to them. For purposes of our analysis, we may not assume that *Knotts* and *Karo* were binding appellate precedent simply because that is what law enforcement, with assistance from the U.S. Attorney's Office, concluded at the time of their decision to place the GPS on Katzin's van. Thus, law enforcement made a deliberate decision implicating constitutional principles on the basis of a 3-1 circuit split, absent any specific authorization for their conduct. What if the split had been 2-2 or 1-3? Is there a basis from which one can imagine that law enforcement's decision would have been different?

True, the police did not act in a total vacuum, but their chosen course of action when presented with such a novel constitutional predicament is nonetheless worrisome. In lieu of a binding proclamation from either this Circuit or the Supreme Court—and instead of seeking approval from a neutral magistrate—law enforcement personnel looked to other (non-binding or distinguishable) authorities like our sister circuits' decisions. Essentially, they extrapolated their own constitutional rule, in consultation with the U.S. Attorney's Office, and applied it to this case. This intra-executive agency consultation falls short of a basic requirement of the Fourth Amendment: that "where practical, a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is

8

sufficient to justify invasion of a citizen's private premises or conversation." *United States v. U.S. District Court* (*Keith*), 407 U.S. 297, 316 (1972).  Simply put, the police in this case dodged a basic constitutional separation of powers requirement by choosing to assume a constitutional rule not clearly established by binding judicial precedent.

I do not believe that this intra-executive consultation absolves police personnel's behavior.  Now, the assumption by law enforcement that their own self-derived rule sanctioned their conduct becomes true, thanks to the majority's analysis.  Such decision-making is wrongful conduct that can and should be deterred—for that is the primary purpose of the exclusionary rule!  The police practice at issue here effectively disregarded the possibility that we could find a GPS search constitutes a Fourth Amendment violation requiring a warrant.

Where we have not yet ruled on the constitutionality of a police tactic, law enforcement personnel have two choices: (a) assume that their conduct violates the Fourth Amendment and that we will require them to obtain a warrant, or (b) gamble, at the risk of having evidence excluded, that we will find no Fourth Amendment violation in a particular situation. This is in line with the Supreme Court's suggestion that law enforcement officials should be incentivized to "err on the side of constitutional behavior." *United States v. Johnson*, 457 U.S. 537, 561 (1982).[6] Excluding the evidence in this

---

[6] *Johnson* addressed retroactive application of Fourth Amendment decisions.  In discussing the matter, the Court stated:

case would incentivize just that and would therefore result in "appreciable deterrence" of future Fourth Amendment violations. *Leon*, 468 U.S. at 909 (internal quotation marks omitted).

I would not hold, of course, that the police can never make assumptions about our future Fourth Amendment rulings. If their analysis is correct and we ultimately affirm the constitutionality of a search, then the police are rewarded with full use of any evidence derived from the search. If their analysis is wrong, however, and the search is ultimately held to be unconstitutional, then the police cannot avoid the cost of

> If, as the Government argues, all rulings resolving unsettled Fourth Amendment questions should be nonretroactive, then, in close cases, law enforcement officials would have little incentive to err on the side of constitutional behavior. Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question. Failure to accord *any* retroactive effect to Fourth Amendment rulings would encourage police or other courts to disregard the plain purport of our decisions and to adopt a let's-wait-until-it's-decided approach.

*Johnson*, 457 U.S. at 561 (footnote and internal quotation marks omitted).

10

suppression by relying on the good faith exception. Of course, the police can avoid this entire issue by requesting a warrant in the first instance, a task unburdened by time nor trouble.

Law enforcement personnel can rightly rely on a number of sources for Fourth Amendment guidance—including relevant decisions by the Supreme Court and this Circuit, warrants, and statutes. We, both as a court and as a society, expect that law enforcement officers will consult these sources—it is a part of how we expect reasonable officers to act. *Davis*, 131 S. Ct. at 2429. Deterring such activity, therefore, would not serve the purposes of the exclusionary rule. *Id.* This case is different. Nothing in a law enforcement officer's duties forces him either to rely on non-binding appellate precedent or to conduct the Fourth Amendment calculus himself by extrapolating from, or analogizing to, existing case law. Where an officer decides to take the Fourth Amendment inquiry into his own hands, rather than to seek a warrant from a neutral magistrate—particularly where the law is as far from settled as it was here—he acts in a constitutionally reckless fashion.

The legal landscape in this case predominantly consisted of the out-of-circuit GPS cases, the Supreme Court's beeper decisions, and the overarching privacy expectation framework for Fourth Amendment analysis adopted in *Katz* and deemed to be the sole rubric for analysis until *United States v. Jones*, 132 S. Ct. 945 (2012). Taken together, the majority contends, these sources provide the legal authority that would lead a reasonable law enforcement officer to conclude that he was acting within the confines of the Constitution when attaching a GPS tracker to the undercarriage of Harry Katzin's van. I do not agree that this

11

collection of authority warrants application of the good faith exception because I remain discomfited by the lack of binding appellate guidance or other neutral authorization underlying the police action at issue here. Therefore, I would hold that the police acted with sufficient constitutional culpability to require exclusion and, more importantly, that suppression in this case would help deter future Fourth Amendment violations.

My intention would not be to bind the hands of law enforcement. I merely believe that the investigatory process established by the Constitution is the proper one: that police officers get a warrant prior to conducting a search. This is also consistent with *Karo*, where the Court expressly rejected the Government's argument that requiring a warrant prior to beeper tracking would be too laborious and would substantially impede investigations. *See Karo*, 468 U.S. at 717 ("The Government's contention that warrantless beeper searches should be deemed reasonable is based upon its *deprecation of the benefits* and *exaggeration of the difficulties* associated with procurement of a warrant. The Government argues that the traditional justifications for the warrant requirement are inapplicable in beeper cases, but to a large extent that argument is based upon the contention, rejected above, that the beeper constitutes only a minuscule intrusion on protected privacy interests . . . . Requiring a warrant will have the salutary effect of ensuring that use of beepers is not abused, by imposing upon agents the requirement that they demonstrate in advance their justification for the desired search.") (emphasis added).

Thus, I conclude that in the absence of binding appellate precedent from the Supreme Court or this Court, law enforcement must—as it has been required to do since the

founding of this country—comply with the warrant requirement of the Fourth Amendment. This is clear and easy to follow. This rule gives police officers not only sufficient discretion, but also sufficient guidance to achieve their objectives.

## II. Why *Knotts* and *Karo* Do Not Constitute Binding Appellate Precedent

The majority elects to make an alternative holding: that *Knotts* and *Karo* are binding appellate precedent.[7] I disagree.

*Knotts* and *Karo* stand for two propositions, only one of which the majority has elected to acknowledge. First, in *Knotts* the Supreme Court held that "[a] person traveling in an automobile on public thoroughfares [generally] has no reasonable expectation of privacy in his movements from one place to another." *Knotts*, 460 U.S. at 281. Second, the Supreme Court stated that there remained the possibility that twenty-four hour, "dragnet type law enforcement practices" could implicate "different constitutional principles." *Id*. at 283-84.

The Supreme Court portended the exact case we have before us now. The Court astutely foretold that

---

[7] While the Supreme Court has leant its imprimatur to alternative holdings, *see, e.g., MacDonald, Sommer & Frates v. Yolo Cnty*., 477 U.S. 340, 346 n.4 (1986), in this instance I believe that the use of an alternative holding emphasizes the majority's dubious faith in their argument that *Knotts* and *Karo* constitute binding appellate precedent.

13

improvements in technology that would permit twenty-four hour surveillance (i.e., GPS) might indeed present "different constitutional principles." *Id.* And now that this case is before us, the majority ignores this second, critical takeaway from *Knotts* and misrepresents that it constitutes binding appellate precedent for purposes of permitting a *Davis*-based good faith exception ruling.

In addition to *Knotts'* warning about "dragnet type law enforcement practices," discussed in more detail below, there are three additional reasons why *Knotts* and *Karo* are not binding appellate precedent, contrary to the majority's insistence: (1) the marked technological differences between beepers and GPS trackers, (2) the placement by police of the beepers inside containers with the consent of the owners in those cases, and (3) the uncertainty in this area of law created by the D.C. Circuit decision, *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), which preceded the application of the GPS device to the Katzin vehicle.

*Technological Differences*

Our case concerns a "slap-on" GPS tracker, so called because it magnetically attaches to the exterior of a target vehicle, is battery operated, and thereby requires no electronic connection to the automobile. The tracker uses the Global Positioning System—a network of satellites originally developed by the military—to determine its own location with a high degree of specificity and then sends this data to a central server. This check-and-report process repeats every few minutes (depending on the tracker), thereby generating a highly accurate record of the tracker's whereabouts throughout its period of operation. The great benefit of such a system—apart from its accuracy—is that anyone with

14

access to the central server can analyze or monitor the location data remotely. These aspects make GPS trackers particularly appealing in law enforcement contexts, where the police can attach a tracker to some vehicle or other asset and then remotely monitor its location and movement.

GPS technology is vastly different from the more primitive tracking devices of yesteryear—"beepers." Beepers are nothing more than "radio transmitter[s], usually battery operated, which emit[] periodic signals that can be picked up by a radio receiver." *Knotts*, 460 U.S. at 277. In contrast to GPS trackers, beepers do not independently ascertain their location—they only broadcast a signal that the police can then follow via a corresponding receiver. Moreover, beeper signals are range-limited: if the police move far enough away from the beeper, they will be unable to receive the signal that the unit broadcasts. At bottom, then, beepers are mere aids for police officers already performing surveillance of a target vehicle. Unlike GPS trackers, beepers require that the police expend resources—time and manpower—to follow a target vehicle physically.

In a Ninth Circuit denial of a petition for rehearing on the GPS question, Chief Judge Kozinski issued a fiery dissent from the denial, accusing the *Pineda-Moreno* majority of being "inclined to refuse nothing" to the needs of law enforcement. *United States v. Pineda-Moreno*, 617 F.3d 1120, 1121 (9th Cir. 2010) (Kozinski, C.J., dissenting). In his dissent, the Chief Judge noted that GPS devices "have little in common with the primitive devices in *Knotts*," in part because, unlike GPS devices, beepers "still require[] at least one officer—and usually many more—to follow the suspect." *Id.* at 1124. Thus, the dissent noted, while "[y]ou can preserve your anonymity from prying eyes, even in public, by

15

traveling at night, through heavy traffic, in crowds, by using a circuitous route, disguising your appearance, passing in and out of buildings and being careful not to be followed," there is "no hiding from the all-seeing network of GPS satellites that hover overhead, which never sleep, never blink, never get confused and never lose attention." *Id.* at 1126.

As noted above, the *Knotts* Court specifically indicated that, in contrast to the officers' limited use of the beeper in that case, more expansive monitoring, (e.g., a "twenty-four hour," "dragnet type law enforcement practice[]") could implicate "different constitutional principles." *Knotts*, 460 U.S. at 283-84. The Supreme Court, in issuing *Knotts*, did not want the case to stand for the proposition that new technology that allows for more invasive surveillance would automatically be permissible for the same reasons as allowed in *Knotts*.

In fact, in numerous cases, the Supreme Court and Courts of Appeals have expressed caution about the extension of their holdings regarding the permissibility of certain law enforcement conduct to situations involving future technology. *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 36 (2001) ("While the technology used in the present case was relatively crude, the rule we adopt must take account of more sophisticated systems that are already in use or in development.");[8] *see also United States v. Garcia*, 474 F.3d

---

[8] *See also Kyllo*, 533 U.S. at 33-34 ("It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology. For example, as the cases discussed above make clear, the technology enabling human flight has exposed to public view (and hence, we have said, to official

---

994 (7th Cir. 2007) (Posner, J.) (echoing the concern expressed in *Knotts* that it might need to reevaluate its conclusion if faced with a case concerning use of GPS technology for mass surveillance); *United States v. Robinson*, 903 F. Supp. 2d 766, 785-87 (E.D. Mo. 2012) ("The need for caution in this age of developing technology should be clear. Other Supreme Court cases, by their rulings or their language, have given notice that earlier pronouncements may not control when the technology changes or the nature and degree of intrusion changes.").

Even before *Katz*, when the Supreme Court articulated the "reasonable expectation of privacy" test, the Supreme Court was balancing the "need for effective law enforcement against the right of privacy" in considering whether a particular situation constituted an exception to the Fourth Amendment's warrant requirement. *Johnson v. United States*, 333 U.S. 10, 14-15 (1948) (considering warrantless searches based on probable cause). The law enforcement community should have been on notice that they might not be entitled to use warrantless twenty-four hour surveillance through the use of new technology.

*Consent*

Another critical difference between *Knotts* and *Karo* and *Katzin* is the presence or absence of consent. The majority derisively dismisses this issue as an "elaborate ruse."

---

observation) uncovered portions of the house and its curtilage that once were private. The question we confront today is what limits there are upon this power of technology to shrink the realm of guaranteed privacy.") (citations omitted).

17

Majority Op. at 21. However, the "elaborate ruse" enabled the law enforcement officers to place the beeper into a can of ether, with the can owner's consent. *Karo*, 468 U.S. at 708 ("With Muehlenweg's consent, agents substituted their own can containing a beeper for one of the cans in the shipment . . . ."). Similarly, consent was present in *Knotts* because law enforcement placed a beeper into a container of chloroform with the consent of the chemical manufacturing company where the suspect purchased the chloroform. *Knotts*, 460 U.S. at 278 ("With the consent of the Hawkins Chemical Company, officers installed a beeper inside a five gallon container of chloroform . . . .").

It is true that both of these cases established the principle that no Fourth Amendment search occurs where officers use beeper-based electronics to monitor an automobile's movement on public roads because a person has no reasonable expectation of privacy regarding that information. However, neither case addressed the direct installation of a tracking device onto or into a vehicle, as is the case here. First, the defendant in *Knotts* did not challenge the original installation of the beeper, but only the use of the information that it emitted. *See id.* at 286 ("I think this would have been a much more difficult case if respondent had challenged, not merely certain aspects of the monitoring of the beeper installed in the . . . container . . . , but also its original installation.") (Brennan, J., concurring); *Karo*, 468 U.S. at 713 ("As the [*Knotts*] case came to us, the installation of the beeper was not challenged; only the monitoring was at issue.").

This distinction is important, particularly in light of *Jones*'s determination that GPS tracking abridges Fourth Amendment rights on the ground that the installation of the

18

GPS constituted a trespass. *Jones*, 132 S. Ct. at 949 ("The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was first adopted."). When *Knotts* and *Karo* are applied to *Katzin*, consent is a critical difference that renders their use as binding appellate precedent doubtful.

*Maynard Muddies the Waters*

Finally, there is the *Maynard* decision, which, if the technological differences and consent distinctions were not enough, sufficiently muddied the waters so that law enforcement officers could not know whether the attachment of a GPS device to the undercarriage of a vehicle would violate the Fourth Amendment. In *Maynard*, the D.C. Circuit split from three sister circuits to hold that prolonged GPS surveillance constituted a search. *Maynard*, 615 F.3d at 563-65. In so doing, the court rejected the *Knotts*-based argument that a driver's movements over the course of an entire month are exposed to the public and therefore do not constitute information shielded by the Fourth Amendment. *Id.* at 560. This decision was rendered four months prior to the agents' conduct at issue here.

At the same time, the court in *Maynard* rejected the applicability of the automobile exception to the warrant requirement, holding that while the exception "permits the police to search a car without a warrant if they have reason to believe it contains contraband[, it] . . . does not authorize them to install a tracking device on a car without the approval of a neutral magistrate." *Id.* at 567. A year later, the Supreme Court granted certiorari, under the name *United*

19

*States v. Jones*. 131 S. Ct. 3064 (2011) (Jones and Maynard were co-defendants). *Maynard* thus focused on the quality and quantity of information gathered during the extended surveillance. *Maynard*, 615 F.3d at 562 (noting that prolonged surveillance, unlike short-term surveillance, exposes "what a person does repeatedly, what he does not do, and what he does ensemble," revealing more information than an isolated trip).

This case should have given law enforcement pause as to the applicability of *Knotts* and *Karo* to the new world of GPS. At the very least, they should have known that prolonged surveillance could be an issue and one that could be easily fixed by getting a search warrant from a neutral magistrate.

By its plain terms, the express holding in *Davis* is inapposite to this case because I believe that *Knotts* and *Karo* do not qualify as appropriate binding appellate precedent. Neither case involved a physical trespass onto the target vehicle; in both cases the police placed the beeper inside of a container which was then loaded into the target vehicle by the driver (all with the container owner's permission). *See Karo*, 468 U.S. at 708; *Knotts*, 460 U.S. at 278. Additionally, both *Karo* and *Knotts* addressed the use of beepers, which—as I have already explained—are markedly different from GPS trackers. *See Maynard*, 615 F.3d at 556-57.

## III. Conclusion

The majority's good faith analysis is flawed because it finds that, where the law is unsettled, law enforcement may engage in constitutionally reckless conduct and still reap the benefits of the good faith exception. Fourth Amendment

20

jurisprudence dictates a different outcome. When the law is unsettled, law enforcement should not travel the road of speculation, but rather they should demonstrate respect for the constitutional mandate—obtain a warrant. Anything less would require suppression. I cannot condone the majority's accommodation to law enforcement at the expense of our civil liberties. I am compelled to dissent.

SMITH, J., *Circuit Judge*, dissenting, joined by McKEE, *Chief Judge*, AMBRO, FUENTES, and GREENAWAY, JR., *Circuit Judges*.

I join Judge Greenaway's eloquent dissent in its entirety. There is little that can be added to Judge Greenaway's devastating critique. I write here only to expand on a worrisome facet of the majority's reasoning. Because *Knotts*[1] and *Karo*[2] are factually distinguishable and did not hold that the specific conduct engaged in here by government agents was permissible, i.e., attaching a GPS device to Harry Katzin's van, the majority is required to hold that the officers' conduct was consistent with the "rationale underpinning" those decisions. References to Supreme Court "rationale" are liberally sprinkled throughout the opinion. *See Majority op.* at 18, 21, 22, 24, 31, 36, 38. If what the majority is suggesting is that law enforcement officers may rely not just on holdings, which are truly the stuff of precedent, but also on appellate court rationale, I find such a suggestion both troubling and impractical. What is the limiting principle to be applied to these extrapolations? And just what legal hermeneutic will lay police officers be applying as they engage in such on-the-spot analysis of the real-life cases they confront? I can discern no ready answer to these questions.

---

[1] *See United States v. Knotts*, 460 U.S. 276 (1983).
[2] *See United States v. Karo*, 468 U.S. 705 (1984).

1

I do see, however, considerable tension between an approach that permits law enforcement officers who invoke the good faith exception to take refuge in the rationale of certain Supreme Court cases, and the limiting language which the Supreme Court itself chose to employ in *Davis* which referred to binding precedent "specifically authoriz[ing]" a particular police practice. *United States v. Davis*, 131 S. Ct. 2419, 2429 (2011). The majority's legal framework eliminates the objectively reasonable source underpinning the good faith exception: authorization from a neutral magistrate or binding judicial precedent. *Id.* at 2428. The law enforcement officers' choice to commandeer the task of Fourth Amendment legal analysis in the face of patent ambiguity surely falls within the sort of "deliberate, reckless, or grossly negligent" conduct that provides a strong "deterrent value of exclusion" that may "outweigh the resulting costs." *Id.* at 2427 (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)) (internal quotation marks omitted). By not cabining to the judiciary the analysis of ambiguous and, in this case, conflicting case law, the majority turns the warrant requirement on its head.

For this reason, and for those so ably expressed by Judge Greenaway, I respectfully dissent.

2